**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


**UNITED STATES OF AMERICA**           )

               **v.**                               )        **CR. NO. 24-CR-391 (JEB)**

**JARETT LEWIS**                       )

_____ )



<u>**MEMORANDUM IN AID OF SENTENCING**</u>



**"The true measure of our character is how we treat the poor, the disfavored, the accused, the incarcerated, and the condemned."**

Bryan Stevenson

As a child growing up, Jarett Lewis saw the transformative impact that a strong community, a sound education, and loving parental guidance can have on a child.  He was raised by a single mother who struggled to provide him with a stable safe home and community.  When he was in high school, he went to live with his aunt and attended an elite private school in Detroit.  There, he excelled in school and in basketball.

His sense of commitment to others and desire to impart the values he learned on others shines through in his character.  Those closest to him explain

> Jarett has been a deeply engaged and positive force within both the Northeast Washington D.C. and Baltimore basketball communities for many years. He welcomed individuals into these circles, not just as someone participating in the sport, but more significantly as a mentor and a leader for young people. I have personally witnessed him offer consistent and genuine encouragement to numerous aspiring young athletes, helping them to develop their confidence and drive, both on and off the court. Beyond his involvement in athletics, Jarett was also instrumental in organizing various community service initiatives. I specifically recall his dedication to events focused on providing meals and support to the very communities that have supported his son's endeavors. These actions truly reflected his underlying character and his strong commitment to giving back and making a tangible difference in the lives of others.[i]

> Jarett has dedicated himself to service in ways that often go unnoticed: organizing community events, volunteering his time at local schools, hosting free basketball camps, and investing deeply in the success of the next generation. He has offered more than advice, he has offered presence, compassion, and hope.[ii]

In *Just Mercy: A Story of Justice and Redemption*, Bryan Stevenson stated, "[e]ach of us is more than the worst thing we've ever done."  The § 3553(a) factors recognize this because they require the Court to examine the history and

characteristics of the defendant.  While the U.S. Sentencing Guidelines recommend a certain sentence based on criminal history and offense level, courts have in most fraud cases given lower than guideline sentences.  Those defendants were more than the offenses they committed.

Jarett Lewis, through undersigned counsel, hereby respectfully submits this Sentencing Memorandum.  He respectfully requests a sentence of 9 months, for three reasons.  First, the current fraud sentencing guidelines are flawed because it was the U.S. Sentencing Commission's attempt to address high-profile fraud without empirical data to support tougher sentences.  Second, courts have rejected the fraud guidelines by examining other ways to comply with the directives of 18 U.S.C. § 3553(a) factors without anchoring sentences on the guidelines.  Third, variances are warranted here because of Mr. Lewis's his extraordinary family circumstances.

## Case Background

On August 24, 2024, an Indictment was filed against Mr. Lewis, charging him with nine counts of Wire Fraud, in violation of 18 U.S.C. § 1343.  Less than six months later on February 13, 2025, Mr. Lewis pled guilty to Count One of the Indictment and pursuant to the plea agreement, the government will move to dismiss the remaining counts of the Indictment.

## Sentencing Law

### 1. History – From unfettered discretion to Guideline bound.

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[1]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[2]  Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges.[3]  Congress answered Judge Frankel's call and in 1984 the Sentencing Commission was born.  For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended in 2005, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively **advisory**."[4]  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account

---

[1] Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).
[2] *Id.* at 228.
[3] *Id.* at 228.
[4] *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added)

when sentencing."[5]   While holding that district courts should still consider the

Guideline calculations and ranges for sentencing purposes, the Supreme Court in

*Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18

U.S.C. § 3553(a).   Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u>

among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and

characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to
promote respect for the law, and to provide just
punishment for the offense;
(B) to afford adequate deterrence to criminal
conduct;
(C) to protect the public from further crimes of the
defendant; and
(D) to provide the defendant with the needed
educational and vocational training, medical
care, or other correctional treatment in the most
effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable
category of defendant as set forth in the guidelines— (i)issued by
the Sentencing Commission pursuant to section 994(a)(1) of title
28, United States Code, subject to any amendments made to such
guidelines by act of Congress (regardless of whether such
amendments have yet to be incorporated by the Sentencing
Commission into amendments issued under section 994(p) of title
28); and (ii) that, except as provided in section 3742(g), are in effect

---

[5] *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).

on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct;

and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'"[6] to comply with "the four identified purposes of sentencing:   just punishment, deterrence, protection of the public, and rehabilitation."[7]   In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.[8]

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.**[9]

With that limitation and considering all of the purposes of sentencing, the Court

must impose a sentence that is "**sufficient, but not greater than necessary**, to

---

[6] *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).

[7] *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

[8] 18 U.S.C. § 3661.

[9] 18 U.S.C. § 3582(a) (emphasis added).

comply with the purposes [of sentencing]."[10]

### 2. The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors.[11]  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the range is more reasonable than a sentence outside of the range.[12] The sentencing court further shall not presume that a sentence outside of the Guidelines is unreasonable.[13]  By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure."[14]

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual

---

[10] *Id.* § 3553(a) (emphasis added).
[11] *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).
[12] *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46.
[13] *Id.*
[14] *Rita*, 551 U.S. at 351.

and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'"[15]  "But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for."[16]

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'"[17]

> It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the unintended anchoring effect that the guidelines can exert. … Anchoring leads to cognitive error not insofar as judges intentionally use the guidelines in an advisory fashion, but instead when judges irrationally assign too much weight to the guidelines range, just because it offers some initial numbers.[18]

Another reason to resist anchoring a sentence to the Guidelines is that the

---

[15] *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).
[16] *United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)
[17] Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).
[18] *Id.* at 524 (inner quotation marks and citation omitted); *see also United States v. Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

guidelines are not always based on empirical data. "A district court may deviate from a sentencing guideline where empirical data shows that adherence to it would yield a sentence that is 'greater than necessary.'"[19]

### 3. Courts still anchor sentences to the guidelines even after the Supreme Court has held the guidelines are advisory.

Seven years after *Booker*, the Commission analyzed sentencing practices and found that courts still give guideline sentences. In 2012, the Commission stated that the guidelines "remained the essential starting point in all federal sentences and . . . **continued to exert significant influence on federal sentencing trends over time.**"[20] Courts must be concerned whether the guidelines are "truly *advisory*"[21] if they still "exert a significant influence over sentencing."[22] In addition, courts should have grave concerns about the guidelines when the sentencing structure is not based on empirical data.[23]

### 4. The Fraud Guidelines are not consistent with empirical data.

The Supreme Court has explained that the U.S. Sentencing Commission "fills an important institutional role...to 'base its determinations on empirical data and

---

[19] *United States v. Price*, 649 F.3d 857, 860 (8th Cir. 2011) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)).

[20] U.S. Sentencing Comm'n, *Report on the Continuing Impact of United States v. Booker on Federal Sentencing* (2012), https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/booker-reports/2012-booker/Part_A.pdf. [hereinafter 2012 Booker Report] (emphasis added).

[21] *United States v. Gardellini*, 545 F.3d 1089, 1096 (2008) ("The central teaching of Gall is that the Guidelines are truly advisory.").

[22] 2012 Booker Report, *supra* note 19.

[23] *See Price*, 649 F.3d at 860.

national experience.'"[24]  However, when the Commission fails to base guidelines on empirical data and national experience, the district court may determine that a guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."[25]

The fraud guidelines were "partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom."[26]

> [I]n implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making  a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, **effectively guaranteed that many such sentences would be irrational on their face.**[27]

After the Sentencing Reform Act of 1984, the Commission complied data on prior sentencing practices in white-collar cases and found that many defendants received probation.[28]  The Commission still proceeded with increasing the penalties

---

[24] *Kimbrough*, 552 U.S. at 109 (citation omitted).

[25] *Id.* at 110.

[26] *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

[27] *Id.* (emphasis added) (sentencing defendant to 24 months incarceration where the calculated gain was $15 million.)

[28] *See* U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, at vi (2004), found at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf , last accessed on Sept. 14, 2022) ("Some of the decrease in the use of simple probation following implementation of the guidelines is explained by increased use of intermediate sanctions, especially for "white collar" crimes. These offenders historically were more likely to receive simple probation, but under the guidelines

in white-collar offenses even though the vast majority of judges "did not want to see [the availability of alternative confinement sentencing options] reduced."[29]  The Commission recognized that "[s]lightly more than 40 percent of both responding district and circuit court judges also would like greater availability of sentencing options (particularly **probation-plus-confinement or "split" sentences**) for **theft and fraud offenses**."[30]

"Over the years, Congress mandated adjustments of increasing severity to the Guidelines sentences for fraud."[31]  The Commission followed suit yet failed to make changes in response to empirical data, which is its primary function.

## Argument

For the following reasons, a sentence of 9 months is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing.

## I.    The Nature and Circumstances of the Offense

The details of the nature and circumstances are detailed in the Statement of Offense.   The defense did not dispute that the transactions took place.  Mr. Lewis accepts responsibility for his conduct and is remorseful for the damage he caused.

## II.    Mr. Lewis's History and Characteristics

Mr. Lewis was born in Detroit, Michigan in 1980 during "an era marked by significant economic challenges, social changes, racial tensions and a shifting

---

[29] *Id.* at 4.

[30] *Id.*

[31] *United States v. Herink*, No. 8:10CR169, 2012 U.S. Dist. LEXIS 105549, at *13 (D. Neb. July 30, 2012).

they increasingly are subject to intermediate sanctions, such as home or community confinement or weekends in prison, and imprisonment.")

cultural landscape."[32]  The longtime automotive capital of the world "faced massive

layoffs, factory closures and the outsourcing of many manufacturing jobs. In 1985,

Michigan's unemployment rate peaked at 15.5% amid widespread economic

hardship."[33]   It's no surprise that his mother, who worked at the Ford plant,

struggled to provide for him in his early years.

Young Jarett grew up in a neighborhood comparable to Southeast D.C. at the

time, which he described as "gritty" and "grimy."  Violence and drug use riddled his

neighborhood.  Growing up in violence can have a long-lasting impact.  "[T]he

impact of violence extends well beyond physical injury and patterns of behavior as it

comes to occupy the minds of those living in violence-ridden contexts where thought

processes are often governed by a focus on survival and constant vigilance." [34]

Unfortunately, inside of his household there was no escape from the ills of the

outside world.  His mother struggled with drug use.  His father was in and out of

his life, but mostly out due to serving several stints in prison.  "[C]hildren growing

up in households without the involvement of both biological parents are at greater

risk for negative developmental and well-being outcomes than their counterparts

who grow up in households in which both biological parents are involved."[35]

---

[32] Elisa Robinson, *What was life like in Detroit in the 1980s? Take a look back in time*, Detroit Free Press, March 27, 2024, updated March 1, 2025, available at https://www.freep.com/story/news/local/michigan/detroit/2024/03/27/detroit-1980s-archive-photos/73085603007/
[33] Id.
[34] Bianca E. Bersani *et al.*, *Thinking About Emerging Adults & Violent Crime*, eajustice.org, 6 (May 2019).
[35] Jennifer A. Ray, Jeong-Kyun Choi, and Aurora P. Jackson, *Adverse childhood experiences and behavior problems among poor Black children: Nonresident father*

Further, "[c]hildren whose parents are involved in the criminal justice system, in particular, face a host of challenges and difficulties: psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity."[36]  Mr. Lewis explained that he struggled in school and many times, had to fend for himself.

Life was even more challenging because his mother was in an abusive relationship when he was younger.  The police had been called to his home more than once.  Jarett recalled trying to defend his mother with a golf club against her abusive boyfriend, who had also abused him.  The impact on neglect and abuse on a person's young life has lasting effects on education, employment, and other aspects of life.  Researchers are increasingly understanding the interaction between "adverse childhood experiences" (commonly known as "ACEs") and those individuals who become involved in the criminal justice system.  ACEs "is the term given to describe all types of abuse, neglect, and other traumatic experiences that occur to individuals under the age of 18."[37]  There is a simple ACE questionnaire available, developed by doctors to categorize the most

---

*involvement and single mothers' parenting stress*, Child Abuse & Neglect, Vol. 121, Nov. 2021, 105264, available at
https://www.sciencedirect.com/science/article/pii/S0145213421003379#bbb0075
[36] Eric Martin, National Institute of Justice, Advancing Justice through Science, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, March 1, 2017, available at https://nij.ojp.gov/topics/articles/hidden-consequences-impact-incarceration-dependent-children
[37] *See* CDC, Adverse Childhood Experiences, available at
https://vetoviolence.cdc.gov/apps/phl/resource_center_infographic.html (last accessed Sept. 1, 2020).

common types of childhood abuse and household dysfunction that is correlated with significant health and social implications.[38] The set of ten questions leads to an ACE score, with the higher the number of ACEs, the greater the risk of health and social problems.[39]



Three Types of ACEs

Source: Centers for Disease Control and Prevention
Credit: Robert Wood Johnson Foundation

---

[38] *See* National Council of Juvenile and Family Court Judges, Adverse Childhood Experience (ACE) Questionnaire, available at https://www.ncjfcj.org/sites/default/files/Finding%20Your%20ACE%20Score.pdf (last accessed Sept. 1, 2020); *see also* CDC, About the CDC-Kaiser ACE Study, available at https://www.cdc.gov/violenceprevention/childabuseandneglect/acestudy/about.html (last accessed Sept. 1, 2020).

[39] *See* NPR, Take The ACE Quiz — And Learn What It Does And Doesn't Mean (Mar. 2, 2015), available at https://www.npr.org/sections/health-shots/2015/03/02/387007941/take-the- ace-quiz-and-learn-what-it-does-and-doesnt-mean.

Of the ten questions asked on the traditional ACE questionnaire, Mr. Lewis

answers yes to at least five. The abuse has affected every stage in Mr. Lewis's life.

It is commonly reported:

> Children in homes where one parent is abused may feel fearful and
> anxious. They may always be on guard, wondering when the next
> violent event will happen. This can cause them to react in different
> ways, depending on their age:
>
> - **Children in preschool.** Young children who witness intimate
>   partner violence may start doing things they used to do when
>   they were younger, such as bed-wetting, thumb-sucking,
>   increased crying, and whining. They may also develop difficulty
>   falling or staying asleep; show signs of terror, such as stuttering
>   or hiding; and show signs of severe separation anxiety.
> - **School-aged children.** Children in this age range may feel
>   guilty about the abuse and blame themselves for it. Domestic
>   violence and abuse hurts children's self-esteem. They may not
>   participate in school activities or get good grades, have fewer
>   friends than others, and get into trouble more often. They also
>   may have a lot of headaches and stomachaches.
> - **Teens.** Teens who witness abuse may act out in negative ways,
>   such as fighting with family members or skipping school. They
>   may also engage in risky behaviors, such as having unprotected
>   sex and using alcohol or drugs. They may have low self-esteem
>   and have trouble making friends. They may start fights or bully
>   others and are more likely to get in trouble with the law. This
>   type of behavior is more common in teen boys who are abused in
>   childhood than in teen girls. Girls are more likely than boys to
>   be withdrawn and to experience depression. [40]

"Children who witness or are victims of emotional, physical, or sexual abuse

are at higher risk for health problems as adults. These can include mental health

---

[40] U.S. Department of Health and Human Services, OASH, Office on Women's
Health, *Effects of domestic violence on children*, available at
https://womenshealth.gov/relationships-and-safety/domestic-violence/effects-
domestic-violence-children   (citations omitted).

conditions, such as depression and anxiety. They may also include diabetes, obesity, heart disease, poor self-esteem, and other problems." [41]

Fortunately, his aunt was almost like a fairy godmother in his life. He moved in with her when he was a sophomore in high school. He attended an elite private high school in Detroit. She was nurturing, loving, and at the same, a disciplinarian. She provided the structure and support he desperately needed and had missed growing up. She sent him to Detroit Country Day, an elite private school, in the picturesque community of Bingham Farms outside of downtown Detroit. He described that as a "turning point" in his life. While he still struggled in school, he was a stellar basketball player and graduated from high school and obtained a basketball scholarship to college. In 2004, he graduated with a degree in Economics and a minor in Sociology.

In addition to his aunt, his grandfather also provided financial support and an entrepreneurial spirit for Jarett. In an article about his son, Mr. Lewis describes his grandfather as follows:

> "My grandfather worked on the assembly at the Ford Motor plant, but he was also an entrepreneur with numerous side hustles," said Jarrett. "He'd go to Louisville to buy baseball bats in bulk and sell them outside of Tiger Stadium, or he'd ride to Chicago to pick up alcohol, which was much cheaper, and bring it back to sell in Detroit. He was one of the first African-Americans to own commercial property and residential apartment buildings in the state of Illinois. We had such a strong bond and I loved spending time with him, listening to his stories and soaking in his wisdom." [42]

---

[41] Id. (*Effects of domestic violence on children* ) (citations omitted).

[42] Alejandro Danois, *Kentucky basketball commit's recipe for success - failure, adversity and being told he wasn't good enough*, Sports Illustrated, November 15, 2024, available at https://www.si.com/high-school/boys-basketball/kentucky-

In 2022, while the world was battling the third year of the COVID-19 pandemic, Mr. Lewis was dealing with multiple heartbreaks. He finally reconciled with his father and learned that he had been admitted to Henry Ford Hospital. The day before, he was planning to see his aunt who had been moved to the hospice section of the same hospital. Both his father and aunt had been suffering from medical complications for a long time. His father had been expected to be at the hospital long-term, but he passed away from a long illness after Mr. Lewis was able to see him. The following night, his aunt passed away, after she was moved from the hospice center to a home. In addition to this grief, Mr. Lewis continued to support his mother who has been and continues to struggle with substance abuse.

The most joyous day of his life was the day his son Acaden was born. Knowing the importance of being a present, loving, and supportive father, Mr. Lewis has strived to be more to his son that his father was for him. Acaden is now a star athlete and has been in the public eye due to his basketball talents.[43] The negative attention that this case will have on his son causes Mr. Lewis tremendous grief. As his mother describes, his son has received negative attention because of this case. She states, "[g]iven my Grandson's popularity nationally our Family has had to endure relentless online 'trolling' that most families will never experience."[44]

> When Acaden made the decision to decommit from the University of
> Kentucky, we were attacked merciless by the National Media and

---

basketball-commit-s-recipe-for-success-failure-adversity-and-being-told-he-wasn-t-good-enough-01jcrmyjf04q
[43] Id.
[44] Letter from B. Lewis, Exhibit 3.

Fans:
1) He can't come to Kentucky because needs to be closer to his Father whose headed to prison.
2) His Dads a thief and maybe the kids a thief so let him go elsewhere.
3) Court documents plastered all over tiktok, twitter, and Instagram.[45]

Those who know Mr. Lewis best speak highly of his character and charitable works.  He has been a "mentor and leader for young people" and has been "instrumental in organizing various community service initiatives."[46]  He is a "model of what a true partner and community advocate looks like."[47]  Another friend explains his dedication to young people:

> I first met Jarett through our youth basketball program when his son, Acaden, joined my team.  From day one, Jarett was more than just a supportive parent in the stands—he became a fixture in the lives of these young men. He showed up early, stayed late, and listened when others didn't. He brought a calm, steady presence to boys who often lacked structure in their daily lives. Many of them, some fatherless, some from broken homes, looked to Jarett as a mentor, a counselor, and a consistent adult figure they could count on. He never asked for praise. He simply showed up.[48]

Mr. Lewis has volunteered his time to worthy causes.  He has "organized Holiday Photoshoots for the Children at the Ronald McDonald House, cooked those same families dinner with all of Acaden's teammates and Sidwell families, he's organized food drives on Thanksgiving and Christmas for the homeless in Trinidad and SE, they just completed free basketball clinics in both those areas with DC

---

[45] Id.
[46] Exhibit 1.
[47] Letter from M. McCormick, Exhibit 9.  See additional letters of support at Exhibit 10.
[48] Letter from E. Brown, Exhibit 2.

Parks and Rec."[49]

Mr. Lewis assisted his friend with access to the Detroit Country Day school

gym so he could have a place to escape violence after his cousin and close friend

were shot:

> Jarett, knowing how close I was with the 2 victims immediately called
> to offer not just his condolences and empathy, but offered me to move
> to Detroit to train with him for the summer so I wouldn't be around
> any violence. His fear for my safety and well being led Jarett Lewis to
> make an offer or a bet with me. Although he sensed my hesitation to
> move to Detroit and me feeling a life in Detroit isn't any better than
> my life in Boston, and quite frankly, I'll take my chances in Boston.
> Jarett asked me "if I can get us 24 hour access to my high school gym
> at Detroit Country Day, would you move to Detroit for the summer." I
> figured there's no way a coach of such a prestigious school would
> provide access to the gym. Well, I was wrong and Coach Keener
> allowed us to use the gym from 5am to midnight everyday for the
> entire summer.
>
> Safe to say I went to Detroit. I was so grateful for the opportunity. The
> summer of the year 2000, paved the way for who I am today.[50]

He is described as "an incredible father, a devoted son, and a faithful

friend."[51]  He is "someone who shows up. Someone who takes the time to see people.

Someone who puts others in a position to thrive, even as he's working through his

own challenges."[52] "Despite the mistakes he has made, the values he instilled in me

— hard work, accountability, and community — are unwavering. He is complex. He

is imperfect. But he is also one of the most thoughtful, loyal, and supportive people I

---

[49] Exhibit 3.
[50] Letter from S. Erilus, Exhibit 4.
[51] Letter from M. Martin, Exhibit 5.
[52] Letter from M. McClain, Exhibit 6.

have ever known."[53]

His dedication to basketball has not simply been for his son's benefit, but also for the benefit of other youths. As his son's mother describes, Mr. Lewis has "always been a moving force for the kids and the youth in the DC / DMV area surrounding Acaden and the schools, rec centers, gyms and camps that he attended and has stayed connected to helping improve opportunities for other kids in this area as we were blessed to obtain for our own child."[54]

### III.    The Purpose of Sentencing Will be Accomplished with a Sentence of 9 Months.

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."[55]

### A.    Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is

---

[53] Letter from T. McClain, Exhibit 7.
[54] Letter from N. Pompeo, Exhibit 8.
[55] 18 U.S.C. § 3553 (a).

merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[56]  "[I]t is not severe punishment that promotes respect for the law, it is appropriate punishment." *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009).   Furthermore, fraud crimes are not offenses in which Congress has set a mandatory term of imprisonment, which are typically seen in extremely serious offenses.

> ### B.    The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."  The public will be protected while Mr. Lewis serves the requested sentence.  The public will be protected while he is being supervised by the Probation Officer on release, which will further deter criminal conduct.  He has been compliant with his terms of pretrial release and there is no indication that he cannot comply with the proposed terms of supervised release.

Lengthy prison sentences do not mean the public is safe.  A 2017 Vera Institute of Justice analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it

---

[56] *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

also may dissuade people from committing future crimes out of fear of punishment (deterrence).  **In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs**....[57]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."  *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."  *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial

---

[57] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (last accessed on Sept. 29, 2021) (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/  (last accessed on Sept. 29, 2021) ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

sanctions.").  A lengthy sentence is not needed to deter criminal conduct in this case.

### C.    The Requested Sentence Would Provide Mr. Lewis with the Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.

Under 18 U.S.C. § 3553(a)(2)(D), this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner."  Because of Mr. Lewis's education, health, and lack of abuse history, an incarceration sentence would not necessarily address these needs.

### IV.    The Requested Sentence Properly Reflects § 3553(a) Considerations and Adheres to the Principle that this Court May Not Presume that a Guideline Sentence Is Reasonable.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.[58]   As stated above, courts should resist anchoring a sentence to the guideline numbers.[59] Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a)

---

[58] *Kimbrough*, 552 U.S. at 90.
[59] *See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it.[60]  This Court may not presume that a Guideline sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless."[61]  Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range.[62]  A U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**[63]

The impact of a sentence on Mr. Lewis's family should be strongly

---

[60] *Rita*, 551 U.S. at 348, 350.
[61] *Id.* at 351.
[62] *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.)
[63] *United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

considered here.  His son will be entering college and has a promising basketball career ahead of him.  Mr. Lewis has played a significant role in his son's life and with a lengthy sentence, he cannot be present to support his son as he has been.  Mr. Lewis also support his mother who still struggles with substance abuse.  She lives with him for approximately 6 months out of the year.

## A. Defense Request for A Downward Departure or Variance

As set forth in the PSR, the applicable Sentencing Guidelines range is 30-37 months.  However, a sentence of 9 months would be appropriate and provide just punishment, protect the public, and provide Mr. Lewis with the services he needs.

There are several reasons for the Court to vary outside of the guidelines to sentence Mr. Lewis to 9 months.  First, Mr. Lewis had a challenging upbringing. He witnessed violence against his mother, was abused himself, had an absent father, all of which had serious psychological effects on him.  Second, Mr. Lewis has a low criminal history score and have never spent more than one month in jail. Third, Mr. Lewis has demonstrated acceptance of responsibility and extreme remorse.  He did not dispute the charges and promptly sought a resolution of his case.  Fourth, he has been compliant with his conditions of release.  Fifth, his character, concerns for others, and charitable works reflect positively on his character. *See United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005)(defendant's charitable works which were not simply donating money but included organizing youth football teams, helping others attend college affirmed as a basis for a

downward departure).  Finally, as stated above and further below, the fraud guidelines are not consistent with empirical data.

To properly "calibrate a 'just sentence,'" a court must "consider the collateral effects of a particular sentence."[64]   Mr. Lewis's life will be forever changed because he will no longer be able to work in his field.  *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (finding that the district court in a terrorism case appropriately considered that the "conviction itself already visit[ed] substantial punishment" on defendant by possibly preventing him from future work in his profession) (internal quotation marks omitted); *United States v. Virgil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate by noting that the defendant "was forced to resign his position as State Treasurer" and "suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case.").

## B. The Fraud Guidelines are not consistent with Empirical Data; hence Courts resist anchoring sentences to them.

As stated above, the increase of the fraud guidelines is not based on empirical data.  The Sentencing Commission "'has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic.'"[65]  For example, there is nothing to indicate that white-

---

[64] *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).
[65] *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006).

collar defendants have a tendency to commit violent offenses to justify a harsher sentence. Furthermore, the loss table amounts are not indicative of culpability or seriousness of the offense. "For example, the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child."[66] In several cases, "the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."[67]

The defense submits that if the starting point is guidelines, and the guidelines are flawed, then the court must deviate from that starting point.[68] One way to deviate from that starting point is to consider the guidelines when the Commission used empirical data for the fraud guidelines. If the Court were to use the sentencing guidelines when the Commission relied on empirical data and when the sentencing guidelines were mandatory, Mr. Lewis's guideline range would be 21-27 months.

---

[66] *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005).
[67] *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

[68] *See Price*, 649 F.3d at 860.

§2B1.1.    Larceny, Embezzlement, and Other Forms of Theft

(a)    Base Offense Level: **4**

(b)    Specific Offense Characteristics

    (1)    If the value of the property taken exceeded $100, increase the offense level as follows:

|  | Loss | Increase in Level |
|---|---|---|
| (A) | $100 or less | no increase |
| (B) | $101 - $1,000 | add **1** |
| (C) | $1,001 - $2,000 | add **2** |
| (D) | $2,001 - $5,000 | add **3** |
| (E) | $5,001 - $10,000 | add **4** |
| (F) | $10,001 - $20,000 | add **5** |
| (G) | $20,001 - $50,000 | add **6** |
| (H) | $50,001 - $100,000 | add **7** |
| (I) | $100,001 - $200,000 | add **8** |
| (J) | $200,001 - $500,000 | add **9** |
| (K) | $500,001 - $1,000,000 | add **10** |
| (L) | $1,000,001 - $2,000,000 | add **11** |
| (M) | $2,000,001 - $5,000,000 | add **12** |
| (N) | over $5,000,000 | add **13** |

    (2)    If a firearm, destructive device, or controlled substance was taken, increase by **1** level; but if the resulting offense level is less than **7**, increase to level **7**.

    (3)    If the theft was from the person of another, increase by **2** levels.

    (4)    If the offense involved more than minimal planning, increase by **2** levels.

    (5)    If undelivered United States mail was taken, and the offense level as determined above is less than level **6**, increase to level **6**.

2.15                                          October, 1987

This calculation is based on the following

Base Offense Level = 4

Specific Offense Level = 9

3B1.3 Enhancement = 2

Total Offense Level = 15

### SENTENCING TABLE

#### Criminal History Category

| Offense Level | I<br>0 or 1 | II<br>2 or 3 | III<br>4, 5, 6 | IV<br>7, 8, 9 | V<br>10, 11, 12 | VI<br>13 or more |
|---|---|---|---|---|---|---|
| 1 | 0 - 1 | 0 - 2 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 |
| 2 | 0 - 2 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 | 1 - 7 |
| 3 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 | 2 - 8 | 3 - 9 |
| 4 | 0 - 4 | 0 - 5 | 0 - 6 | 2 - 8 | 4 - 10 | 6 - 12 |
| 5 | 0 - 5 | 0 - 6 | 1 - 7 | 4 - 10 | 6 - 12 | 9 - 15 |
| 6 | 0 - 6 | 1 - 7 | 2 - 8 | 6 - 12 | 9 - 15 | 12 - 18 |
| 7 | 1 - 7 | 2 - 8 | 4 - 10 | 8 - 14 | 12 - 18 | 15 - 21 |
| 8 | 2 - 8 | 4 - 10 | 6 - 12 | 10 - 16 | 15 - 21 | 18 - 24 |
| 9 | 4 - 10 | 6 - 12 | 8 - 14 | 12 - 18 | 18 - 24 | 21 - 27 |
| 10 | 6 - 12 | 8 - 14 | 10 - 16 | 15 - 21 | 21 - 27 | 24 - 30 |
| 11 | 8 - 14 | 10 - 16 | 12 - 18 | 18 - 24 | 24 - 30 | 27 - 33 |
| 12 | 10 - 16 | 12 - 18 | 15 - 21 | 21 - 27 | 27 - 33 | 30 - 37 |
| 13 | 12 - 18 | 15 - 21 | 18 - 24 | 24 - 30 | 30 - 37 | 33 - 41 |
| 14 | 15 - 21 | 18 - 24 | 21 - 27 | 27 - 33 | 33 - 41 | 37 - 46 |
| 15 | 18 - 24 | 21 - 27 | 24 - 30 | 30 - 37 | 37 - 46 | 41 - 51 |
| 16 | 21 - 27 | 24 - 30 | 27 - 33 | 33 - 41 | 41 - 51 | 46 - 57 |
| 17 | 24 - 30 | 27 - 33 | 30 - 37 | 37 - 46 | 46 - 57 | 51 - 63 |
| 18 | 27 - 33 | 30 - 37 | 33 - 41 | 41 - 51 | 51 - 63 | 57 - 71 |

## V.     Similarly Situated Defendants Have Received Below Guideline Sentences.

When sentencing a defendant, the Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[69]

In cases where an employee stole from or caused financial destruction to an employer, the Courts did not anchor themselves to the loss table. In *United States v. Brian Johnson*, No. 3:15-cr-92 (M.D. La), the defendant was terminated from

---

[69] 18 U.S.C. §3553(a)(6).

Georgia-Pacific, one the world's largest paper companies, with a sophisticated computer system. The defendant was an IT specialist and systems administrator. Approximately, two weeks after he was fired, he remotely accessed the company's computer system and transmitted a code and commands that damaged the computer system. The damage caused more than $1.1 million in damages to the company.[70] He was sentenced to 34 months.

In *United States v. Sophia Kim*, No. 21-cr-219-RC, the amount of loss was $1.5 million and the defendant received 42 months of imprisonment. In that case, Kim was the Treasurer and Comptroller of a foundation. She conducted 197 unauthorized debits and cash withdrawals and 139 unauthorized credit card transactions.[71]

In a case where the defendant spent converted funds on a lavish lifestyle and lost at trial, he was sentenced below the tax loss table. In *United States v. Michael Sang Han*, No. 15-cr-142-JEB, the defendant received a sentence of 48 months of imprisonment after trial, where the restitution amount was $4.9 million. According to the government in that case, Han

> converted $14,456,855 in corporate investments made to Envion Inc., a privately-owned technology company for which Defendant was the sole owner, to his own personal income. Defendant used the converted income to live a luxury lifestyle including, but not limited to, the purchase of a $3 million house in West Palm Beach, Florida, $2 million in renovations to the home, and approximately $440,000 on luxury

---

[70] AP News article - https://apnews.com/article/1cc3696d641845f6862f33fcbf63d70b; see also https://www.justice.gov/usao-mdla/pr/former-systems-administrator-sentenced-prison-hacking-industrial-facility-computer
[71] ECF No. 50, Statement of Offense.

automobiles.[72]

Han owed $4.9 million in taxes and filed false tax returns.

Lastly, the Court cannot ignore the impact of race on sentencing. Notably, from 2015 to 2021, Black people sentenced under 2B1.1 have an average sentence of 18 months compared to White people who receive a sentence of 15 months.



---



Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). As a result, Mr. Lewis requests a sentence of 9 months. The requested sentence is not "greater than necessary," and is sufficient for the purposes of sentencing.

## <u>Conclusion</u>

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a sentence of 9 months sufficiently addresses Mr. Lewis's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[i] Letter of Support by C. Gaines, Exhibit 1.
[ii] Letter of Support by E. Brown, Exhibit 2.